## HENRIE v. ROCKY MOUNTAIN PACKING CORPORATION.

No. 7052. Decided July 2, 1948. (196 P. 2d 487.)

See 56 C. J. S., Master and Servant, sec. 194. Applicability and effect of workmen's compensation act in cases of injury to minors, see note, 142 A. L. R. 1018.

For opinion on rehearing see 113 Utah 445, 202 P. 2d 727.

*Ray, Quinney & Nebeker,* of Salt Lake City, for appellant.
*Dilworth Woolley,* of Manti, for respondent.

WOLFE, Justice.

Appeal by the defendant, a corporation, from a verdict and judgment of the Seventh District Court awarding plaintiff damages in an action for the wrongful death of his minor son. The parties will be referred to as they appeared in the court below.

The deceased, a 16 year old boy, was electrocuted, when he attempted to operate a freight elevator owned and operated by defendant corporation as part of its canning plant at Manti, Utah. At the time of his death, decedent was employed by defendant as a filling machine operator in its plant.

The fundamental question involved in this case, is whether or not plaintiff is entitled to maintain this action. It is the position of the defendant, that plaintiff's only remedy is under the Workmen's Compensation Act. By the terms of Section 42-1-57, U. C. A. 1943, the right of the employee to recover compensation against the employer for injuries or death sustained during the course of his employment, is his exclusive remedy, with certain exceptions not here material. Plaintiff, on the other hand, contends that the employment of young Henrie by defendant was illegal, and, therefore, under the rule of *Ortega* v. *Salt Lake Wet Wash Laundry,* 108 Utah 1, 156 P. 2d 885, plaintiff had the right to pursue his common law remedy. The theory upon which plaintiff maintains that the employment of his deceased son was illegal, is that defendant's plant was "a place of employment, dangerous or prejudicial to the life, health, safety or welfare" of a minor within the meaning of Section 14-6-3, U. C. A. 1943, which provides as follows:

"No minor under eighteen years of age shall be employed, permitted, or suffered to work in any place of employment, dangerous or prejudicial to the life, health, safety or welfare of such minor. It shall be the duty of the industrial commission of Utah and the said commission

shall have power, jurisdiction, and authority, after hearings duly held, to issue general or special orders, which shall have the force of law, prohibiting the employment of such minors in any place of employment dangerous or prejudicial to the life, health, safety or welfare of such minors."

It should be noted at this point that both the Child Welfore Act (Title 14, Chapter 6, U. C. A. 1943), and the Workmen's Compensation Act (Title 42, Chapter 1, U. C. A. 1943), both of which are involved in this case, were extensively amended in 1945. However, this case arose prior to the time of those amendments, and we are here governed by the statutes as they existed on July 19, 1944, the date of the fatal accident.

The question posed for our determintion, then, is whether or not the deceased minor was employed in a place of employment dangerous or prejudicial to his life, health, safety, or welfare within the meaning of Section 14-6-3. If he was, then his employment was unlawful and plaintiff is entitled to maintain this action. But if the decedents' employment did not violate the provisions of Section 14-6-3, then the accident was one falling within the exclusive jurisdiction of the Industrial Commission, and plaintiff cannot maintain the action. Before treating the physical facts relating to the defendant's plant, and young Henrie's employment therein, we shall consider the meaning of Section 14-6-3, and especially the phrase "dangerous or prejudicial to the life, health, safety or welfare" of a minor.

The word "dangerous" has been defined as "full of or attended with danger," "risky," "hazardous," "perilous," "full of risk," etc. See Funk & Wagnall's New Standard Dictionary of the English Language and Webster's New International Dictionary, 2d Ed., Unabridged. The antonym of "dangerous" is "safe." There is no place which is "absolutely safe," i. e. where there is no possibility of accident or injury of any type occurring. What is generally meant by a "safe place," is one which is relatively safe, one where an accident or injury is not likely, or is very unlikely, to occur. A "dangerous place" on the other hand is one

where there is considerable risk, or danger, or peril, one where accidents and injuries are very apt to occur.

When the legislature prohibited the employment of minors in places "dangerous * * * to the life, health, safety," etc., it did not prohibit employment of minors in all places which were not "absolutely safe." Such a construction would amount to a general prohibition against the employment of minors, since as already pointed out, there is no such thing as an "absolutely safe place." Clearly the legislature did not intend this. What the legislature meant by a "dangerous place" was one not merely where there was some risk or peril or bare possibility of accident or injury, but one where the likelihood of accidental injury occurring is materially and appreciably greater than in what is considered a "safe place." The words "dangerous" and "safe" are both relative terms.

The meaning and purpose of Section 14-6-3, is to declare a policy that certain places of employment are unfit for the employment of minors under 18 years of age because it is to be anticipated that in such places hazards will be encountered to which such minors should not be exposed because of their lack of experience and judgment and which employees of experience and maturity are better able to avoid, and that certain kinds and places of employment are unsuited to minors and they should not be employed therein for reasons of their health, safety, and welfare. The same section of the statute gives to the Industrial Commission power to seek out places of employment which are dangerous or prejudicial to the life, health, safety, or welfare of minors, and to issue orders having the force of law banning the employment of minors under the age of 18 in such places. But the prohibition of the statute is not limited to those places of employment condemned by order of the Industrial Commission; it extends to all places of employment which are dangerous or prejudicial to the life, health, safety or welfare of minors, regardless of whether or not the Industrial Commission shall have prohibited the employment of minors in such places.

Was employment of minors in defendant's plant of the type sought to be prohibited by Section 14-6-3? Was defendant's plant dangerous to the life, health, safety, or welfare of young Henrie within the meaning of the statute? Were there risks, dangers, or hazards there, which by reason of his youth and inexperience in life he should not have been subjected?

The facts relating to Henrie's employment at the plant are these:

The defendant employed a few persons on a permanent or year-around basis, but during the busy time of the year —during the canning season—in summer months when school was not in session, it was the custom of defendant to employ youths of high school age to work in its plant as additional temporary help.

On about July 15, 1944, four days before the fatal accident, Henrie was employed by defendant to work in its plant as a filler, or filling machine operator. There is nothing in the record to indicate that there was anything about the operation of the filling machine that was inherently or intrinsically dangerous. Nor does plaintiff so contend.

It appears that occasionally cans came through the filling machine improperly filled, and when this happened it was young Henrie's duty to remove such cans from the machine. From time to time, when there was a lull in operations, it was the duty of Henrie to gather up these partially or improperly filled cans and remove them to the second or third floor.

As heretofore noted, in conjunction with the operation of its plant, and as a part thereof, defendant ran an electric freight elevator. The elevator was operated by means of a cable which ran the length of the shaft. Persons using the elevator operated it by pulling the cable up or down, thus throwing an electric switch, whereby the machinery was thrown into operation and the elevator caused to move up or down. Prior to 1944 defendant had experienced some trouble with the elevator, and occasionally employees had

received light shocks when touching the control cable. Defendant had had the elevator machinery inspected, and the electrician had taped a certain electric conduit, (not the control cable) and it was thought that the trouble had been eliminated. However, just before the opening of the 1944 canning season, or "campaign," as it was commonly called by the witnesses, it was discovered that there was a short circuit in the motor which permitted electricity to leak into and through the control cable. This could be corrected only by rewinding the motor, but to have this work done, would have necessitated dismantling the motor and shipping it to Salt Lake City, thus taking it away from the plant at the time it was needed most—during the campaign.

The electrician advised the superintendent of the plant that the elevator could be made reasonably safe for operation by taping the control cable. Accordingly, defendant had the control cable taped with both rubber and friction tape for a space of several feet at every landing.

The elevator was located about 60 feet from the filling machine where young Henrie was required to work. There was a stairway leading to the second and third floors somewhat closer to the filling machine. It is contended by the plaintiff, that decedent had the option of using either the stairway or the elevator when taking cans to the floor above. This contention finds no support in the record. Garbe, the plant superintendent, testified quite positively that he instructed young Henrie to use the stairs, and expressly prohibited him from using the elevator. Several witnesses who were permanent or year around employees, testified that there were notices on the elevator prohibiting employees from using it without permission of the superintendent. There is no evidence whatsoever that Henrie was ever given express permission to use the elevator. Insofar as the record shows, Henrie had never attempted to operate the elevator prior to the time of the fatal accident. It does appear that Henrie had been on the elevator a few times with Devon Anderson, when Anderson was hauling caps and Henrie was assisting Anderson. But in these instances

neither Anderson nor Henrie, but some other employee, operated the elevator. It was necessary for Anderson to use the elevator to haul caps, but the evidence is clear that the cans required to be transported upstairs by Henrie were light, and could easily be carried by hand. There is some evidence that in years prior to 1944 fillers had either express or implied permission to use the elevator, but the record is barren of any evidence that during the 1944 campaign fillers were permitted to use the elevator without permission of the superintendent. The evidence conclusively shows that Henrie's duties did not require him to use the defendant's freight elevator.

It further appears that from time to time there would be temporary halts in the operations of the plant. If there was to be a long halt, a whistle would be blown, signifying a rest period, and employees could leave their stations and go outside the building. However, if there were no whistle, employes were required to remain at their stations and be ready to resume work, whenever operations should be renewed. During the time production was suspended employees were expected to clean up around their stations, and otherwise prepare for a resumption of operations. It was during these short stops which were not rest periods that young Henrie was expected to collect the defectively filled cans which had accumulated around his station during the course of operations and to transport them to the second or third floor.

On July 19, 1944, at about 3:30 p. m. there was a temporary suspension of operations. This was not one of the rest periods during which employees were permitted to leave their stations. Young Henrie called to a Miss Chapman, a young lady of his acquaintance who was working nearby, and suggested that they take an elevator ride to the roof of the building. At the same time, it was suggested that they take a box of cans to the top floor. Miss Chapman was aware that it would be an infraction of the rules to leave her post, but she consented, apparently rather re-

luctantly, to accompany Henrie on his proposed adventure. They walked over to the elevator and Henrie told her to take hold of the control cable and bring the elevator to the ground floor. Miss Chapman was not familiar with the operation of the elevator, and was unsuccessful in her attempt to start it. Whereupon Henrie reached for the cable. As Henrie reached for the cable Miss Chapman glanced back toward her station to see whether or not operations had resumed. When she looked toward Henrie again, he was slumped over the gate which extended across the entrance to the elevator shaft. Nobody saw young Henrie grasp the control cable, but the reasonable inference from the surrounding facts and circumstances is that he grasped the control cable above the insulation of tape heretofore mentioned and was electrocuted. At the time of the accident, Henrie's clothes were wet with brine.

On the record before us it cannot be said that defendant's plant was a place of employment dangerous to the life, health, safety or welfare of minors within the meaning of Section 14-6-3. No claim has been made, and there is nothing in the record to suggest, that there was anything about the filling machine, or about young Henrie's duties in relation thereto that was dangerous or hazardous to a greater degree than the situations ordinarily encountered in every day life. The only thing about the plant which has been suggested as presenting unusual hazards or dangers greater than those ordinarily encountered by an individual in his every day life, was the presence of the freight elevator, with the defect permitting electric current to pass through the control cable. As we have heretofore noted, Henrie's duties not only did not require him to make use of the elevator, but there is strong evidence that he was positively prohibited from using the elevator. There is no evidence in the record to show express or implied permission to operate the elevator. Deceased's duties did not require him to come within the zone of potential harm of the elevator.

The mere existence of defects in the electrical circuit of defendant's elevator did not thereby render 'the plant a place of employment dangerous to the life, health, and safety of Henrie. The cable was not so situated that employees of the plant were apt to come into 'contact with it inadvertently. Moreover, the cable had been insulated for a space of several feet at every landing, for the purpose of protecting those employees whose duties required them to use the elevator. Defendant had been advised by the city electrician of Manti that an insulation of tape would make the elevator reasonably safe for operation. And had it not been for the fact that Henrie grasped the cable above the insulation, and for the further fact that at that time he was well grounded because of the saturation of his clothes with brine, the fatal accident never would have occurred.

It might have been negligence for defendant not to have insulated the cable for so great a space that an employee could not possibly reach an exposed portion of the cable. It might have been negligence not to have used heavier insulation. It might have been negligence not to have posted large warning signs. Perhaps it was negligence to use the elevator at all. But these are questions with which we are not now concerned. What we are concerned with here is whether or not the presence of this elevator in its defective condition upon defendant's premises thereby rendered its plant a place of employment dangerous to the life, health, safety or welfare of its minor employees as meant by Section 14-6-3. Our judgment is that it did not. Defendant's plant was not within the class of places of employment for minors prohibited by the statute.

One other point must be noticed. At the time of his death young Henrie was unmarried, childless, and left no dependents. The Industrial Commission took jurisdiction of this accident and ordered defendant to pay $1,000 into the state treasury as provided by Section 42-1-64(1), and in addition thereto, to pay $150 toward the burial expenses of decedent. These orders were complied with by defendant. However,

plaintiff now contends that payment of $1,000 into the state treasury is not a benefit to him, and hence not compensation and therefore he is entitled to prosecute this action under Article XVI, Section 5, Constitution of Utah, which provides as follows:

"The right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, *except in cases where compensation for injuries resulting in death is provided for by law.*" (Italics added.)

And section 104-3-10 provides, insofar as material here, as follows:

"*Except as provided in chapter 1, of Title 42,* a father, or, in case of his death or desertion of his family, the mother, may maintain an action for the death or injury of a minor child when such injury or death is caused by the wrongful act or neglect of another; * * *." (Italics added.)

Under the constitutional and statutory provisions above quoted plaintiff is entitled to maintain this action, unless the death of his son falls within the compensation provisions of the Workmen's Compensation Act. The question posed for us is this: Where the decedent dies without dependents, are the payment of money into the state treasury, as provided by Section 42-1-64 (1), and the payment of the statutory sum for burial expenses, "compensation" within the meaning of the above quoted constitutional provision?

The above quoted section of the Constitution, as it was orginally worded, did not include the italicized words. They were added by a constitutional amendment adopted in 1920 and effective January 1, 1921. The purpose of this amendment, and the reason for it, are revealed in its history.

The original Workman's Compensation act was enacted by our legislature in 1917. As originally enacted, the statute gave the dependents of a workman killed in the course of his employment the option of (a) suing under the wrongful death statute; or (b) accepting the death benefits provided by the compensation act. Comp. Laws Utah 1917, Sec.

3127. The statute was necessarily in the alternative form, since to have made the death benefits provided by the act the exclusive remedy of the dependents would have been a clear violation of Article XVI, Section 5 of the State Constitution as it then existed. In order to remedy this situation, the section was amended by adding thereto the words italicized by us in the quotation of the section. The next session of the legislature then amended the compensation act by providing that employers who complied with the provisions of the compensation act should not be liable under the wrongful death statute for death of employees, except as otherwise provided by the act. Laws of Utah, 1921, C. 67, Section 3127. For the more complete history, see the opinion of Mr. Justice Hanson in *Halling* v. *Industrial Commission*, 71 Utah 112, 263 P. 78.

As we have seen, the compensation act was enacted and effective prior to the adoption of the amendment to Article XVI, Section 5 of the Constitution. Consequently, the amendment to the Constitution is to be construed in the light of the statutory provisions existing at the ■ time of its adoption. Section 3140(1), Comp. Laws of Utah 1917, was similar to Section 42-1-64 (1), U. C. A. 1943. It provided that in case the deceased workman left no dependents, the employer or insurance carrier should pay the burial expenses of the deceased, and should pay into the state insurance fund the sum of $750. And Section 3112 (6), Comp. Laws of Utah 1917, defined compensation as "the compensation and benefits provided for in this title." This is substantially the same as Section 42-1-42 (6), which defines compensation as "the payments and benefits provided for in this title."

Also: Workmen's Compensation Acts were designed to correct what had become a generally recognized evil. Prior to their enactment, the personal representatives or heirs of a workman killed in the course of his employment could not recover for his death, unless negligence on the part of the employer could be established. Moreover, the defenses of contributory negligence, voluntary assumption of risk,

and the fellow servant rule, frequently defeated the cause of action. Even where recoveries were had, they usually came only after months or years of expensive litigation, and were largely reduced by attorney's fees and other costs. On the other hand, where recoveries were allowed, sympathetic juries frequently returned grossly excessive verdicts. The situation was well stated in *Stertz* v. *Industrial Commission,* 91 Wash. 588, 158 P. 256, Ann. Cas. 1918B, 354.

The intention of the acts, then, was to secure workmen and their *dependents* (not heirs or personal representatives) against becoming objects of charity, by making reasonable compensation for calamities incidental to the employment, and to make human wastage in industry part of the cost of production. 28 R. C. L. 713, Workmen's Compensation Acts, Section 2.

Compensation is a concept wholly different from that of damages. Damages are based upon fault, are generally limited only by the findings and conscience of the jury, and in death cases are payable to heirs or personal representatives without regard to dependency. Compensation, on the other hand, generally has no relation to fault, is fixed or limited by statute, and is payable to dependents only. See 28 R. C. L. 757, Workmen's Compensation Acts, Section 51.

Plaintiff contends that because the money paid by defendant or its insurance carrier into the state treasury did not benefit him, it was not compensation within the meaning of Article XVI, Section 5 of the Constitution. Viewed in the light of the history of that section of the Constitution, and of the Workmen's Compensation legislation, the contention is untenable. The amendment to the Constitution was not designed or intended to preserve all of the rights formerly guaranteed, *and also* to create new rights. On the contrary its very purpose was to abrogate some of the rights formerly held by persons entitled to sue under the wrongful death statute. "Compensation," as used in the amendment to the Constitution, means the same as it is used and defined in the compensation act, i. e. any pay-

ment required by the act to be made to a workman or to his dependents, or for their benefit, or into the state treasury for the special purposes of the compensation act. This includes disability payments, death benefits, medical and hospitalization expenses, burial expenses, and payments into the state treasury as provided by the act. Compensation does not connote or require payment to, or for the direct benefit of a non-dependent parent, who would have been able to maintain an action for wrongful death prior to the amendment to the state Constitution. The payment of part of decedent's burial expenses and of $1,000 in the state treasury in accordance with the order of the Industrial Commission, and as provided by statute, was payment of "compensation" within the meaning of Article XVI, Section 5, of the Constitution. Plaintiff has no constitutional or statutory right to maintain this action.

The judgment below is vacated and it is hereby ordered that judgment be entered in favor of the defendant and against the plaintiff, no cause of action. Costs to appellant.

McDONOUGH, C. J., and PRATT and LATIMER, JJ., concur.

WADE, Justice (dissenting).

I agree that if deceased minor was employed in a place which was dangerous to his life, health or safety, his employment was unlawful and plaintiff can maintain this action; that the prohibition of Section 14-6-3, U. C. A. 1943, is not limited to places condemned by the commission but extends to all places of employment which are dangerous to minors and that to constitute a "dangerous place" requires more than the bare possibility of injury but there must be a likelihood of injury appreciably greater than there is in a "safe place." I do not agree that injuries must be *very apt to occur* in order for a place to be dangerous for a minor to work in.

An employer is held to be negligent where he fails to furnish his employee with a safe place to work and this is especially true in case of a minor employee. In my opinion an unsafe place for a minor to work as defined in negligence cases would constitute a dangerous place of employment for a minor under the above statute. In the prevailing opinion there is no comparison made of these two concepts but it concedes that though the defendant might have been negligent in a number of things which tend only to make the plant an unsafe place to work it also requires that an injury must be very apt to occur in the minor's place of employment before it is a dangerous place of employment under the above statute. From these and other holdings in that opinion I conclude that it intended to require a place of minor's employment to be more dangerous in order to come within the prohibition of this statute than would be necessary to constitute the employer negligent in failing to furnish a minor with a safe place to work. With such a holding I do not agree. I think that an unsafe place to work under the negligence cases is a dangerous place of employment under this statute, and that there is no zone as far as a minor is concerned which would be an unsafe place to work under the negligence cases but not be a dangerous place of employment under the statute, and that the legislative intent was to prohibit the employment of minors in all places which would be an unsafe place for a minor to work under the negligence cases.

I disagree with what defendant argues and the prevailing opinion seems to intimate, that in order to come within the prohibition of this statute a place of employment must be more dangerous to a minor than to an adult. The statute prohibits the employment of a minor in a dangerous place the same whether such place is equally as dangerous for an adult to work in as where a minor will encounter hazards which on account of his inexperience he is less able to avoid than is an adult. The statute expressly, positively and unambiguously forbids the employment of a minor in any place which is dangerous to his life, health and safety; it

contains no requirement that the place must be more dangerous to a minor than to an adult. To read into that statute such a requirement would be unadulterated judicial legislation. Certainly the legislature did not intend to allow a minor to be employed in a dangerous place merely because the place is equally as dangerous to an adult. The policy of the law usually is to protect a minor from hazards on account of his immature judgment even though an adult person in a similar situation would be allowed to take a chance.

The prevailing opinion says that,

"Deceased's duties did not *require* him to come within the zone of potential harm of the elevator",

that,

"There is no evidence whatsoever that Henrie was ever given *express* permission to use the elevator. Insofar as the record shows, Henrie had never attempted to operate the elevator prior to the time of the fatal accident. * * * the evidence is clear that the cans required to be transported upstairs by Henrie were light, and could easily be carried by hand."

That,

"There is some evidence that in years prior to 1944 fillers had either express or implied permission to use the elevator, *but the record is barren of any evidence that during the 1944 campaign fillers were permitted to use the elevator without permission of the super-intendent.* The evidence conclusively shows that Henrie's duties did not require him to use the defendant's freight elevator,"

that

"The cable was not so situated that employees of the plant were apt to come in contact with it inadvertently,"

that

"*There is no evidence in the record to show* express or *implied permission to operate the elevator.*" (Emphasis mine. Where they are on a single word they are to call attention to the narrow limits placed on the statement of facts, where to a number of words they indicate,

as will be presently pointed out, that I think it is not an accurate statement of what the record shows or that something is implied which does not fairly reflect the evidence.)

Apparently it is the position of the prevailing opinion that the facts stated in the above quotations were conclusively shown so that the jury could not reasonably disbelieve them. Except as to the questioned statements, I do not disagree with such position.

While the evidence shows that the cans required to be transported to the upper floors were light and a few boxes of such empty cans could be easily carried up the stairs, still the evidence shows that at times a large number of boxes of empty cans accumulated and were loaded on wooden slats and it required two men to place them on the elevator and take them to the upper floors. At such times it would be much more convenient to take them on the elevator. As will be later pointed out, the superintendent in his testimony said "there was no objection I suppose" if they wanted to do it that way.

On whether the fillers used the elevator to carry the empty cans to the upper floors during the campaign of 1944, there is no evidence whatever as to what fillers other than the deceased did in that respect. Anderson who had previously during the 1944 campaign worked as a filler said that he used the elevator, and had operated it, but did not say whether he had done so while working as a filler; he also testified that Wels Westenscow had operated the elevator to take him and decedent up to the upper floor, that this boy was either a capper or a filler and worked only during the campaign. Anderson also not only testified as pointed out in the prevailing opinion that he and decedent together hauled loads of caps down from the upper floors but that they, as pointed out above, hauled loads of boxes of empty cans up on the elevator; he further testified that he knew that deceased sometimes used the elevator in taking a few boxes of empty cans to the upper floor alone when not accompanied by Anderson. There was no evidence that even intimated that there was any change in the practice in using

the elevator during the 1944 campaign from what it had been in previous years.

Of course I do not claim that there is evidence that decedent was given express permission to use the elevator. I claim that there is no evidence in the record that any employee was ever given express permission to use it; but the practice was throughout the entire period covered by the evidence that the employees who had work to do which required its use went ahead and used it without express permission.

The prevailing opinion further says that:

"Garbe, the plant superintendent, testified quite positively that he instructed young Henrie to use the stairs, and expressly prohibited him from using the elevator. Several witnesses who were permanent or year around employees, testified that there were notices on the elevator prohibiting employees from using it without permission of the superintendent," that, "there is strong evidence that he was positively prohibited from using the elevator."

That opinion does not indicate that such evidence is considered conclusive on that question. By using the term "evidence is conclusive of the facts," I mean, to use a commonly used expression, that the evidence is such that no reasonable mind could find to the contrary. Or to more accurately express the same idea that in view of all the evidence a finding to the contrary would be unreasonable. This is true since what we are concerned with is not whether the mind which does the finding is a reasonable mind, but whether the finding itself is a reasonable one in view of all the evidence. It is only when the evidence is such that only one reasonable finding of fact can be made therefrom or when the jury finds facts which cannot be reasonably found from all the evidence that a question of law is presented. And since this is a law case and we can only review the law and not the facts, in the absence of a special finding of these facts by the jury, we must presume that the jury found the necessary facts which will sustain their verdict if the evidence is sufficient to justify such a finding. In other words if the evidence is such that a finding that the facts are

contrary to the above quoted statements of the evidence would be reasonable and such a finding of the facts would sustain the verdict then we are powerless under the law to reverse the jury's decision. *Horsley* v. *Robinson,* 112 Utah 227, 186 P. 2d 592; *Helper State Bank* v. *Crus,* 95 Utah 320, 81 P. 2d 359. That such is the law this court has held many times and I believe it has never expressed an opinion to the contrary. However, there may be cases where by inadvertence, we have overlooked the fact that such rule was applicable to the case and applied a different one. It is immaterial what the evidence shows unless the evidence is conclusive we cannot review the evidence nor determine the preponderance thereof; that is a matter for the jury to decide.

The prevailing opinion does not discuss the details of the evidence but merely makes broad general statements of its contents. If we keep in mind that where there is a conflict in the evidence we must assume that the jury found facts which were necessary to sustain the judgment in all cases where the evidence is sufficient to support such a finding, the conclusion reached by the prevailing opinion cannot be supported without us holding as a matter of law that plaintiff cannot recover unless decedent was expressly instructed to operate this elevator, or that he could not possibly do the work he was required to do without operating it, and that otherwise he did not come within its danger zone. Is that the rule that should be applied in determining whether this was a dangerous place of employment for this minor boy? I think the mere statement of it makes its fallacy apparent. How many employees only do what they are expressly instructed or their work absolutely requires them to do?

In negligence cases the rule is that if the employer could anticipate that the employee would do something in the course of his employment which under the surrounding circumstances would be dangerous to him, then he has not been furnished a safe place to work. *Pauly* v. *McCarthy,* 109 Utah 398, 166 P. 2d 501, *Id.,* 109 Utah 431, 184 P. 2d 123. That is the rule which we recently applied to the

proprietor of a place of business, in the recent case of *Hayward* v. *Downing*, 112 Utah 508, 189 P. 2d 442. We applied the same rule in *Twin Peaks Canning Co.* v. *Industrial Comm.*, 57 Utah 589, 196 P. 853, 855, 20 A. L. R. 872, in a Workmen's Compensation case to determine whether the accident which took the life of a minor occurred in the course of his employment. There the accident occurred on an elevator which the minor had been forbidden to use, and he was using it for a purpose which concededly had no connection with his work. In that case speaking through Mr. Justice Frick we said,

"* * * * that the commission was authorized to infer from the evidence that the canning company either knew or should have known that the boys were using the elevator to pass from the first to the second floor."

We further said,

"But we are here not dealing with an adult, with a man of mature years and experinece, but with a mere boy without experience and with an abundance of life and vigor. Here * * * the injured lad had outgrown his childish fears, but had not yet reached the age when, by reason of his experience and judgment, he would exercise a very great degree of care or caution for his own safety and protection. * * * the acts of the deceased * * * in view of his age and immaturity of mind, * * * were not unnatural nor without the bounds or reason."

I fully recognize that we are not considering whether the defendant was negligent nor whether he was acting within the course of his employment. But our present problem is whether under this statute decedent's place of employment was dangerous. We are now considering a different proposition from the one we were considering at the beginning of this opinion where the negligence cases were mentioned. There we were discussing the quality of danger necessary to bring it within the statute, now our problem is whether the evidence brings decedent within the zone of potential harm from this elevator.

I contend that decedent was within the zone of potential harm if the employer should have reasonably forseen that he was apt in the course of his employment to use or operate it and thereby be injured regardless of whether or not he was expressly authorized or required to use or operate it. Why should that be the rule in negligence cases and not in this case? The object of this statute was undoubtedly to protect minors from the hazards of dangerous places of employment. A place of employment is no less dangerous to a minor where he comes in contact with the danger only because on account of his inexperience he does not realize the danger or how to avoid it, than it is where he has been expressly required to come in contact with the danger. Under Section 88-2-2 U. C. A. 1943, we are required to liberally construe the statutes with a view to effect their objects. The objects of this statute certainly cannot be effected unless we hold that if the employer could reasonably forsee that this place of employment was dangerous to decedent then it was a dangerous place of employment for him. To hold otherwise would be almost shocking to our modern conception of human laws. I shall attempt to demonstrate from the evidence that if this rule is applied this was a dangerous place of employment and plaintiff can maintain this action.

In order to make the evidence understandable, a short review of the situation is necessary. Decedent was employed by defendant on Saturday, July 15, 1944, and was elecrocuted the next Wednesday while in such employment on the 19th of that month. If he worked on Sunday, the evidence being silent on that point, he only worked there 5 different days including the day he commenced and the day he was killed and only 4 days if he did not work on Sunday. He was assigned to work at a filler station and given instructions on his duties by the superintendent. Across the same table from him Devon Anderson worked as a capper, each performing a different necessary process in the canning of peas. Anderson was older than decedent and although a seasonal worker, had been employed there longer and had previously worked

as a filler. Dorris Chapman a 16 year old girl worked on a cooker, her station was 5 or 6 feet from that of the decedent. There were other people working in the immediate vicitnity, there being three lines of cans in that neighborhood requiring a filler and capper for each.

It is undisputed that some of the cans would come through the process not properly filled. It was the filler's job to take such cans out of the line and if he was not then pressed with other duties to empty, clean and place such cans in empty boxes provided for that purpose, but if at the time he was rushed to take care of his work he would throw them on the floor and when he had time would collect them and empty the ones which had been partially filled and place them in the empty boxes and when there was a lull in the operations it was his duty to take these boxes of empty cans which he had accumulated up to the second or third floors where they would be again placed in the line for filling. At times during these operations there were car loads of empty cans being unloaded on the outside of the plant into a conveyor which would take them to the upper floors and when this was going on the filler could take them out to these cars instead of carrying them upstairs. There was a stairway from the room where his station as a filler was which went to the upper floors and also the elevator. It was possible to use either of these means in taking these boxes of empty cans to the upper floors.

From the evidence it is clear that deceased did use the elevator occasionally with Anderson in taking loads of boxes of empty cans to the upper floors and returning with loads of caps to their stations and that at times he took a few boxes of empty cans to the upper floors on the elevator without Anderson.

Is the evidence such that the jury could reasonably find that no notices were posted on or near the elevator during the time decedent was employed by defendant, which forbade the use of the elevator without permission of the superintendent? Nine witnesses testified directly on this question,

four said they did not see any such notices, and five said the notices were there all the time, two of them said they thought the notices were there at the time of the accident. Anderson and Miss Chapman who worked near the deceased and were there at the time of the accident, both said that they did not see any such notices but did not look for them. Derrel Henrie a brother of decedent who worked there in 1941 and Smith who worked there until the fall before the accident said they were positive that there were no such notices there when they worked there. Although some claim agents took the statements of various witnesses at the plant the day following the accident, and the general instructions to employees and instructions to fillers were preserved and produced at the trial, and inspectors with the superintendent carefully inspected the elevator immediately following the accident, no witness testified positively that he had seen these notices posted on or near the elevator either immediately before or after the accident. No such notice or a copy thereof was produced at the trial and there was no explanation why none was produced. The witnesses were allowed to testify as to the contents of such notices by memory without objection and without any showing why the notices were not produced.

It is quite unusual that defendant did not produce any such notices or make any showing why they were not available. It is also unusual that with inspectors, claim agents and the superintendent examining that elevator and the plant for evidence immediately after the accident, that no one was produced who could say definitely that he had looked purposely to see if those notices were there and that he remembered that they were there, as was the case with respect to the tape on the cable. If such notices were posted as it is claimed they were, and if they said what it is claimed they did, they were very material evidence in this case. Certainly some one would have thought to look and see if they were there immediately after the accident, and would have preserved them for the trial, as they did the fillers instructions and the general instructions; or at least would

have remembered having looked to see if they were there and could have given direct testimony that he remembered seeing them there at that time. In my opinion, from all the evidence, the jury were well within reason in finding that no such notice was posted at or near the elevator during the time that deceased worked there.

But even if the notices were posted as it is claimed, it is doubtful that they were sufficient to give decedent notice of their contents. Decedent's duties required him to work in the neighborhood of this elevator, he was required to take cans up to the upper floors; sometimes the elevator would probably be going right up his way operated by some one else, sometimes his companion had to bring caps down from an upper floor on the elevator and it was very convenient for the two of them to take a load of empty cans up and bring a load of caps down. It is common for persons of his age to be curious and adventuresome and to be attracted to machinery and particularly elevators. The elevator was dangerous to his life. Yet the only warning, if any, to keep away from the dangers of that elevator if any, were typewritten notices which in substance said:

"Don't use the elevator without permission of the superintendent."

It is not claimed that these notices warned that the elevator was dangerous or that it must not be used in any event. Typewriting is quite small for a notice intended to warn busy factory workers not to use an elevator. Such notice could be read only when within a few feet thereof. These notices, if there, did not attract the attention of either Anderson or Miss Chapman who worked near decedent, although Anderson had been there longer than decedent and had used the elevator much more than he did. In my opinion in order to isolate this elevator so that decedent would be beyond the sphere of its potential dangers, it would require a notice much larger than it is claimed this one was so that it would be sure to attract attention, and which would warn him of it in no uncertain terms.

But even if the jury believed that such notices were posted, it would not be unreasonable if they refused to believe that such notices expressly forbade the use of the elevator except after first obtaining permission of the superintendent. Testimony from memory of the substance of a notice which the witness does not claim to have seen within a period of more than two years is very apt to be inaccurate. To illustrate this, the witness Tennant tried to give the substance of four words contained in the Filler's Instructions but two of those words cannot be found in such instructions.

If these notices as was testified to, said:

"Don't use the elevator without express permission of the superintendent.",

then every witness who testified that he used the elevator did so in violation of the provisions of those notices. At least nine witnesses testified to using the elevator in the course of his work but no witness said that he had ever expressly received permission to do so by the superintendent.

Their testimony covered a period of years and all testified that whenever they had work to do which required the use of the elevator they used it without getting express permission of the superintendent. The testimony nearest to claiming express permission from the superintendent was that of Derrel Henrie brother of the deceased, and as I understand it he simply said in substance that all the fillers had permission to use the elevator to take the empty cans to the upper floors. The superintendent himself did not mention any specific incident when he was asked for or gave his permission that an employee could use the elevator. The substance of his testimony was that when their work required it the employees were expected to use the elevator without express permission. It would indeed be very unusual to have an elevator in a canning plant where its use, as the testimony here shows, was very important to the operation of the plant during the campaign, and yet require every one to keep off it unless they first obtained express

permission to use it. If these notices were worded as the testimony claims they in substances were, they forbade its use by permanent as well as temporary employees and not only prohibited its operation, but the use thereof when it was going the same way and being operated by some one else. In view of this testimony, I think it highly improbable that there was any notice which did more than forbid the use of the elevator except when the employees work required its use.

But if the jury found that such notices were there the evidence is almost conclusive that they had been customarily disregarded over a period of years. Plaintiff, decedent's father, was employed in defendant's plant from 1928 to 1940 inclusive, the last four years thereof he was assistant superintendent; throughout that period he testified that the employees were using the elevator whenever their duties required and the management knew it but made no objections thereto, and that this was true of the fillers in taking the empty cans back to the upper floors. In this he was corroborated by his son Derrel Henrie who worked as a filler in that plant during the campaign of 1941. As previously pointed out every witness who testified about using the elevator testified that he used it whenever his work required its use without getting express permission of the superintendent, and their evidence covered the entire period to the time of the accident. No one made any claim that the custom was changed in 1944. Anderson testified positively that he and deceased followed that custom right down to the time of the accident, as did the witnesses for the defendant. Although the superintendent categorically denied that he had failed to enforce these notices and denied that he knew of their customary violation, his testimony indicated that such was what he expected them to do. His testimony will be considered more in detail later, but I think it is clear therefrom that he expected the employees to use the elevator whenever their work required its use and that he did not expect that they would get his express permission to do so. In view of this evidence the jury certainly could

reasonably find, even though they believed that such notices were posted and in substance said what defendant claims they did, that throughout the years such notices were customarily disregarded and the elevator was used without permission of the superintendent whenever an employee had freight to move which required its use. The evidence is clear that decedent and Mr. Anderson did have freight to move to the upper floors and other freight to bring down from the upper floors to their stations when they loaded the wooden slats with boxes of empty cans and took them to the upper floors and then loaded those wooden slats with caps and returned with them to their stations, and that decedent also used it to take boxes of empty cans up to the upper floor without Anderson. Garbe, the plant superintendent, testified that he instructed decedent not to use the elevator. Can we hold as a matter of law that such testimony was true? I think not. According to Garbe's testimony no one else was there and heard him give those instructions, only decedent and Garbe knew what instructions were given, the mouth of deceased has been closed by death. Under Section 104-49-2, usually where that is the case, the surviving person cannot testify as to matters equally within the knowledge of himself and the deceased person. It may be that such section does not bar the testimony of the superintendent in this case, and I am aware that prominent writers have criticized the policy of such a statute, holding that such evidence should be received for what it is worth. But no one contends that the testimony of an interested witness, who gives his testimony knowing that there is no living witness that can contradict what he says, has the convincing force that the testimony of a disinterested witness does, who knows that there are others who are acquainted with the facts to which he testifies and may contradict his evidence. Under such circumstances we held in *Smith* v. *Industrial Commission*, 104 Utah 318, 140 P. 2d 314, that the trier of the facts did not have to take such evidence as true, but could reasonably find to the contrary. I think that such is the rule that should govern this case.

The Superintendent testified that he hired the decedent and gave him his trainee instructions. His testimonoy on this point is general and mostly of what is generally told a new man rather than specifically what he said to decedent. He was uncertain of when but was positive that sometime he had told decedent not to use the elevator but to use the stairway in taking the cans to the upper floors. He denied categorically that he had given decedent permission to use the elevator for that purpose; denied that he knew that it was being used by decedent for that purpose, and denied that he had allowed the use of the elevator generally without permission. However, he would only say that he might have told decedent not to take the boxes of empty cans to the elevator and leave them there until some one else took them up, and that he might have told other fillers not to use the elevator for that purpose; on these questions he was not sure at all. He did not explain why he could remember telling decedent not to use the elevator but was uncertain as to the others. He repeatedly said that the elevator was there to haul freight and not to play with, and that he told that to decedent. When asked about the capper and filler working together in taking the cans to the upper floor he said if they wanted to do so there was no objection.

Under these facts and circumstances in my opinion a finding by the jury that in the oral instructions of the superintendent to deceased he had gone no further than to tell him not to use the elevator except when he had occasion to do so in his work would be reasonable. Also that it would be reasonable to find that no instructions had ever been given him to always take the empty cans up the stairway, and that in using the elevator in taking the empty cans to the upper floors with Anderson and bring caps back down to their stations, and even when he was taking only a few boxes of empty cans up, he was doing only what he was permitted to do by the defendants. Anderson testified definitely that it was necessary for him to use the elevator to bring his caps down, that others had taken him on the elevator to show where to get the caps and the superintend-

ent said that the elevator was for freight, and the two of them working together was not objectionable. I therefore am of the opinion that the jury could well find that decedent was permitted to use this elevator in both of these operations and that he was not going out of the line of his duties in so using it.

In argument defendant's counsel stresses the distinction between operating the elevator and merely using it with some one else doing the operating. But I find no testimony that this distinction was emphasized or even mentioned either in the oral instructions or the written notices. It is claimed that in all cases he was told not to use it, and no mention is made of its operation. If he was permitted to use it he was within its dangerous sphere, but if he was permitted to use it then there was no instructions that he should not operate it in such use. From the foregoing it is clear that the defendant should have known that this was a dangerous place of employment to this minor, and therefore his employment was not lawful, and plaintiff can maintain this action.

If this conclusion is correct then the other questions dissolve and do not require special consideration. If decedent was permitted to use the elevator in his work it was a dangerous place to work, and the defendant was guilty of negligence in furnishing him with such a place to work, and defendant was not guilty of contributory negligence. Any claim to the contrary is based on the contention that he was violating defendant's instructions. But if the jury found to the contrary on that question and such finding is supported by the evidence then we are bound by such finding and must consider that to be the fact in determining whether decedent was negligent or not. If such were the facts it is hard to conceive how it could be contended that decedent was guilty of negligence. All the testimony tends to show that decedent was required to keep his station clean, and if boxes of empty cans had accumulated he was required to take them to the upper floors when there was a lull in the canning process. It is undisputed that it was during such

a lull that decedent was killed, and that he had with him some boxes of empty cans which he was intending to take to an upper floor. There is no evidence that he had ever been told or any sign had notified him that the elevator was dangerous. Even the superintendent did not claim that he had told him that.

Nor was he guilty of negligence in reaching on the cable above the tape, if that is the fact, because he had no notice that it was dangerous to do so. And a boy of his age cannot be presumed as a matter of law to know that doing so would be dangerous.

I therefore think that the judgment of the trial court should be sustained.