370 P.2d 652

DESERT WATERS, INC., an Arizona corporation, and Nicholas Traficanti and Rose Traficanti, husband and wife, Petitioners,

v.

SUPERIOR COURT of the State of Arizona, IN AND FOR the COUNTY OF PIMA, and Lee Garrett, Judge thereof, Respondents,

and

The City of Tucson, a municipal corporation, Real Party in Interest.

No. 7504.

Supreme Court of Arizona.

En Banc.

April 5, 1962.

Rehearing Denied April 24, 1962.

Scruggs & Rucker, Tucson, for petitioners.

H. Earl Rogge, Jr., City Atty., Tucson, for respondent City of Tucson.

Johnson, Darrow, D'Antonio, Hayes & Morales, Tucson, for Home Water Co. and Home Development Co., amici curiæ.

Wade Church, Phœnix, for Public Utilities Assn. of Ariz., amicus curiæ.

John R. Franks, Phœnix, for City of Phœnix, amicus curiæ.

William G. Barnes, Tempe, for City of Tempe, amicus curiæ.

Irving H. Bahde, Jr., Phœnix, for City of Glendale, amicus curiæ.

J. LaMar Shelley, Mesa, for City of Mesa and League of Ariz. Cities and Towns, amici curiæ.

BERNSTEIN, Chief Justice.

This is an original proceeding for a Writ of Prohibition, sought by the petitioner, Desert Waters, Inc. to prohibit the Superior Court of Pima County from issuing an order permitting the City of Tucson to go into immediate possession of the property of petitioner's utility. An alternative Writ of Prohibition was issued by this Court.

At a special election held August 5, 1958, the voters of The City of Tucson approved a proposition under which the City of Tucson would "improve and extend its Water Utility by acquiring by purchase or by eminent domain the property, plant, facilities, rights, or assets of any public utility company or undertaking rendering water service within or without the corporate limits of said City." Thereafter the City of Tucson commenced eminent domain proceedings against the petitioner water company, and served upon it an application for immediate possession under the provisions of § 12–1116 A.R.S. On December 27, 1961, the Superior Court of Pima County granted the City's application for immediate possession, whereupon these proceedings were commenced.

In considering the complex issues presented by this and the companion case of Hughes Tool Company v. The Superior Court of Pima County, 91 Ariz. 154, 370 P.2d 646 (1962), the Court has been ably assisted by the comprehensive briefs of the parties and the amici curiae.

The arguments in favor of the petitioner may be summarized as follows: (1) The immediate possession statute, § 12–1116 A.R.S. violates Art. 2, § 17, of the Arizona Constitution, A.R.S.; (2) § 9–518 A.R.S., a special law governing condemnation of utilities by municipal corporations, precludes the application of § 12–1116, a general eminent domain statute; (3) § 12–1116 cannot be used because the prerequisite findings required by § 12–1112 have not been made; (4) If immediate possession under § 12–1116 is permitted, but compensation is fixed as of the date of trial under § 9–518, an unconstitutional taking without just compensation results; (5) The City of Tucson has not complied with § 9–514 which requires an election when each particular utility company is condemned; (6) The City of Tucson has not complied with Ch. 4, § 1, subdivision 25 of the Tucson City Charter, which also requires an election when each particular utility is condemned.

## Contention No. 1

It is urged on behalf of the petitioner that the immediate possession statute, § 12–1116 A.R.S. is unconstitutional because it violates the provisions of Article 2, § 17 of the Arizona Constitution. This section provides in pertinent part:

"* * * No private property shall be taken or damaged for public or private use without just compensation having first been made, or paid into court for the owner, and no right of way shall be appropriated to the use of any corporation other than municipal, until full compensation therefor be first made in money, or ascertained and paid into court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived as in other civil cases in courts of record, in the manner prescribed by law."

The charge is made that § 12–1116 violates this section in so far as it permits the condemnor to go into immediate possession of the condemned property upon payment into court of twice the amount set by the court as probable damages. According to petitioner this provision does not satisfy the requirement that just compensation must first be made or paid into court for the owner, nor the requirement that such compensation shall be ascertained by a jury. It is argued that the only purpose of the phrase "or paid into court for the owner" is to permit the condemnor to pay the as-

certained amount into court if the condemnee refused to accept the award of the jury.

These contentions find support in some of the early cases. The constitutional provision in question was adopted from the constitution of Washington, Verbatim Report, Arizona Constitutional Convention, 1910, Vol. 3: Afternoon Session of November 25, 1910, page 6. Prior to its adoption by this state, the Supreme Court of Washington considered the section in Lewis v. City of Seattle, 5 Wash. 741, 32 P. 794 (1893). The City of Seattle had appropriated a street right of way under an ordinance which provided that, after appropriation, compensation would be determined by a board of appraisers. The Washington Court reversed a judgment for the condemnee on the theory that the second clause of the constitutional provision permitted the city to offset benefits accruing to the condemnee's remaining land because of the opening of the street, which benefits in the case were alleged to be greater than the value of the right of way taken. The court stated:

"By construing this constitutional provision as requiring payment to be first made in all cases, and giving the second clause the effect of laying down a rule of damages as to the appropriation of a right of way by corporations other than municipal, all conflict between the clauses is avoided, and full force is given to each and every part. Such is the best-sustained construction it can receive." 5 Wash. at 754, 32 P. at 798.

It should be noted that the Washington court did not have before it the clause "or paid into court for the owner," as the ordinance under consideration did not contain any provision securing in advance a guarantee of payment to the condemnee.

In a more recent decision, State ex rel. Eastvold v. Yelle, 46 Wash.2d 166, 279 P.2d 645 (1955), the Washington Court considered a statute which permitted the state to enter upon land sought to be condemned upon paying into court an amount equal to the last unaccepted offer of the state for the property. This statute was held to violate the provision of the Washington Constitution which is identical to Art. 2, § 17 of the Arizona Constitution:

"We conclude that, under Art. I, § 16, amendment 9 of the state constitution, a property owner is entitled to a judicial determination of just compensation, and payment thereof, before the state can deprive him of possession under the power of eminent domain. This includes the right to a jury trial unless waived. RCW 8.04.090, inasmuch as it denies the owner these rights, is unconstitutional." 46 Wash. 2d at 174, 279 P.2d at 650.

In Steinhart v. Superior Court of Mendocino County, 137 Cal. 575, 70 P. 629, 59 L.R.A. 404 (1902), the Supreme Court of California considered the contention that a statute permitting a condemnor to enter the property sought to be condemned upon payment of, or giving security for, an amount sufficient to compensate the condemnee in case the land is finally taken violated a constitutional provision similar to Art. 2, § 17. The court there said:

" * * * The purpose of the amendment is perfectly obvious. If the preliminary possession during the pendency of the proceeding is a taking, within the meaning of the constitution, it cannot be authorized until the damage resulting therefrom has been judicially determined, and the amount has been paid or tendered to the owner. * * *

"I do not agree to the proposition that compensation is made to the owner by paying into court a sum of money before the damage has been judicially determined, and when the property owner cannot take the money. Surely, he is not compensated until he may take the money. It is not paid into court *for him* until he can take it." (Emphasis by the court.) 137 Cal. at 578, 579; 70 P. at 630.

 If these were the only authorities we had before us, we would be constrained to agree with the petitioner. However, a fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent and purpose of the framers of the constitution and the people who adopted it. State ex rel. Jones v. Lockhart, 76 Ariz. 390, 265 P.2d 447 (1953). We may, when a constitutional provision is not clear upon its face, consider extrinsic materials to ascertain the intent of the constitutional framers and the people who adopted the constitution, Ward v. Stevens, 86 Ariz. 222, 344 P.2d 491 (1959). Such materials may include the history of legislation existing at the time the constitutional provision was adopted, State v. Toomey, 135 Mont. 35, 335 P. 2d 1051 (1958); Henrie v. Rocky Mountain Packing Corp., 113 Utah 415, 196 P.2d 487 (1948), and the records of the constitutional convention, Ward v. Stevens, supra; Bohannan v. Corp. Comm., 82 Ariz. 299, 313 P.2d 379 (1957). While no one source is a conclusive indication of the intent of the framers and the people who adopted the constitution, all such extrinsic materials, taken together, may be of great assistance in determining the effect intended, when a constitutional provision is susceptible of more than one interpretation.

From a consideration of the available materials concerning Art. 2, § 17 of the Arizona Constitution, it becomes apparent that the same meaning and effect was not intended by its adoption as the courts of

Washington and California have given to similar provisions in their constitutions.

Prior to statehood, the Territorial Legislature enacted paragraph 2453 Rev.St.1901 which permitted the plaintiff in a condemnation action to take immediate possession of the property sought to be condemned upon deposit of such sums of money as the court or judge might direct, or the execution of undertakings for payment approved by the judge. All money paid was to be deposited with the clerk, subject to the judgment upon trial of the action in regular course, and all undertakings were to be made payable to the clerk for the use and benefit of the several parties in interest. In 1908 the Supreme Court of the Territory held this statute unconstitutional under the fifth amendment of the Federal Constitution because it did not make adequate provision for payment of the condemnee's damages in the event the property was not finally taken by condemnation. However, the court did not accept the contention that the Federal Constitution required that compensation must be paid prior to or at the time the property was taken, and stated that it is only essential that adequate provision for compensation must be made prior to the taking, De Hansen v. District Court, 11 Ariz. 379, 94 P. 1125 (1908).

Thereupon, the Territorial Legislature in 1909 enacted the immediate possession statute which is now § 12–1116 A.R.S., providing for a cash deposit of double the probable damages, and making the deposit security for any damages, including those the condemnee might suffer if the property is not finally taken for public use.

The following year the Arizona Constitutional Convention met and on November 25, 1910, considered § 16 of Proposition No. 94, which is now Art. 2, § 17 of the Arizona Constitution. The report of these proceedings contains a record of a discussion that occurred in connection with a motion to strike the words "other than municipal" appearing in the right of way clause of this provision. The record of this discussion is appended in toto to the opinion in Hughes Tool Co. v. Superior Court of Pima County, 91 Ariz. 154, 370 P.2d 646 (1962), but quotation of excerpts is appropriate here to show that the framers of the Constitution did not consider that this section required an advance jury determination of damages when a municipality entered into immediate possession, but rather permitted such entry under the terms of the statute (now § 12–1116).

The convention had before it a motion of Mr. Franklin to strike the words "other than municipal" in the right of way clause of what is now Art. 2, § 17.

"Mr. Parsons: * * * I take it that the meaning of this provision is that if a municipal corporation desires to open a street that it need not wait

to do that until after a hearing would be required to be had in court and condemnation proceedings had, but that they might go ahead and open up the street, but that the question of compensation, so far as it referred to municipal corporations, would be determined afterward, and that the municipal corporation could not be interfered with in its work in laying out a street or highway until after these proceedings were had, * * *

"Mr. Franklin: * * * I am very familiar with the rule that is recognized in this territory, and it was brought up in a case from Cochise County, where Mr. Perry, as an attorney for a man in Cochise County, had the judgment of the Supreme Court that you could not take a man's property and afterwards pay him for it, but you must first have the damages and give him due and just compensation before you could take it. *After that decision was rendered a statute was enacted in this territory giving corporations, private and municipal, the authority to take the property and afterwards give the damage.* I object to that, but I further object to the phraseology in this paragraph, for the reason that I do not believe it means what the gentleman from Cochise says. * * * (Emphasis added.)

"Mr. Ingraham: *Mr. Chairman, the amendment offered reverts in some particulars to the present rule of the statute. The present rule of the statute is that in cases of municipal improvement property shall not be damaged without just compensation, but the improvement may be made and the compensation paid afterward. * *"* (Emphasis added.)

(The Franklin motion to strike "other than municipal" was defeated and the entire provision adopted as read.)

■ It appears clear to us from the history of § 12–1116 and from discussions of the constitutional convention that the phrase "or paid into court for the owner" in the constitutional provision which states, "No private property shall be taken or damaged for public or private use without just compensation having first been made, or paid into court for the owner, * * *," was used to permit, as an alternative to advance determination, a payment into court of an amount and upon such terms as would adequately secure to the condemnee compensation and damages resulting from granting immediate possession to a municipal corporation, as well as damages for the property taken.

Contention No. 2

The next point that must be considered is whether the specific provisions governing

the acquisition of a public utility by a municipality exclude the application of provisions of the general statutes relating to eminent domain. More specifically, does the existence of § 9–518, which sets forth a procedure for fixing and paying compensation to the owners of the condemned utility, preclude the application of § 12–1116 which permits the court to enter an order letting the condemnor into possession and use of the property prior to final determination of the eminent domain action, and provides a procedure for guaranteeing payment of damages to the condemnee?

 Statutes that are in pari materia should be read together and harmonized if at all possible, Peterson v. Flood, 84 Ariz. 256, 326 P.2d 845 (1958). When statutes relate to the same subject matter, the later enactment, in the absence of any express repeal or amendment therein, is held to have been enacted in accord with the legislative policy embodied in the earlier statute, Frazier v. Terrill, 65 Ariz. 131, 175 P.2d 438 (1947); United States v. State of Arizona, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371 (1935). In so far as the provisions of a special statute are inconsistent with those of a general statute on the same subject, the special statute will control, Knape v. Brown, 86 Ariz. 158, 342 P.2d 195 (1959); Whitfield Trans., Inc. v. Brooks, 81 Ariz. 136, 302 P.2d 526 (1956). The general statute remains applicable, however, to all matters not dealt with in the specific statute, Kay v. Hillside Mines, 54 Ariz. 36, 91 P.2d 867 (1939); Mercado v. Superior Court of Pima County, 51 Ariz. 436, 77 P.2d 810 (1938); State v. Jaastad, 43 Ariz. 458, 32 P.2d 799 (1934). Under these rules of statutory construction the general statute governing immediate possession in eminent domain cases continues to apply to a situation involving a public utility since none of the special statutes, including § 9–518, deal with the subject of immediate possession or specifically exclude the application of the general section.

### Contention No. 3

 The contention is next raised that § 12–1116 cannot apply in this situation since the finding required by § 12–1112 that, "If the property is already appropriated to some public use the public use to which it is to be applied is a more necessary public use," has not been made. Section 12–1112 sets forth prerequisites which must be shown before the power of eminent domain may be exercised under the general eminent domain statutes. Where the exercise of eminent domain powers is authorized under a specific statute which has been complied with, it is not necessary to comply with the general statute. City of Tucson v. Tucson Gas, Electric Light & Power Co., 152 F.2d 552 (9th Cir.1947); Knape v. Brown, 86 Ariz. 158, 342 P.2d 195 (1959). Thus, when the city has complied with the

provisions of the Municipal Bond Article (§§ 9–521 to 9–540 A.R.S.) it is not necessary that the findings required by § 12–1112 be made. City of Tucson v. Tucson Gas, Electric Light & Power Co., supra, and § 9–537 A.R.S.

### Contention No. 4

It is next argued, that if both § 9–518 and § 12–1116 are permitted to apply to the situation where a public utility is condemned by a municipality, an unconstitutional result is reached. If the City could enter into immediate possession of the appropriated utility under § 12–116, this argument goes, it could permit the value of the property to waste away, even doing nothing at all and thereby giving the Corporation Commission grounds for revocation of the franchise. Thus, the amount of compensation, which under § 9–518 is to be fixed as of the date of the commencement of trial,[1] could be much less than the value of the property "taken" at the time immediate entry under § 12–1116 was permitted. It is urged that this would be an unconstitutional taking without just compensation under Art. 2, § 17 of the Arizona Constitution. For authority, this argument relies on Arizona Corporation Comm'n v. Tucson Gas, Electric Light & Power Co., 67 Ariz. 12, 189 P.2d 907 (1948). In that case § 12–1123 of the general eminent domain statutes was held inapplicable to public utilities because it did not provide for compensation for extensions of service that might be required of the utility by the Corporation Commission between the date of summons (when compensation was to be fixed) and the date title passed following judgment.

The courts of the State of California have been concerned with an argument similar to this on several occasions. Prior to 1911, § 1249 Cal.C.Civ.P. provided that the value of the property taken and severance damages should be fixed as of the date of issuance of summons in the action. In answer to the contention that this rule deprived the condemnee of a constitutional right to have compensation fixed as of the time of the actual taking, i. e. at the time of trial, it was said:

> "[T]he fixing of a particular date at a time basis for the estimation of property values in condemnation suits is not a legislative interference with cern and the actual and consequential damages, if any, sustained by the plant, system and business of the public service corporation not sought to be taken by reason of its severance from the plant, system and business to be taken. *Compensation and damages shall be fixed as of the date of the commencement of the trial.*" (Emphasis added)

---

1. "§ 9–518. Compensation for taking public utility

"A. The court or jury shall ascertain and assess the compensation to be paid a public service corporation for the taking of its plant, system and business, which shall include the fair and equitable value of the plant, system and business taken, including its value as a going con-

the right to just compensation guaranteed by the Constitution—which is but another way of stating that there is no vested right to have compensation assessed as of any particular date. * * * [T]he constitutionally guaranteed right to receive just compensation for property taken or damaged for public purposes neither includes nor implies the right to have such compensation ascertained by any particular procedure or as of any certain date." City of Los Angeles v. Oliver, 102 Cal.App. 299, 312, 315, 283 P. 298, 303 (1929).

See also City of Pasadena v. Porter, 201 Cal. 381, 257 P. 526, 53 A.L.R. 679 (1927); San Jose & A. R. Co. v. Mayne, 83 Cal. 566, 23 P. 522 (1890).

In 1911 § 1249 Cal.C.Civ.P. was amended to provide that in actions not tried within a year from the date of summons, damages would be fixed as of the date of trial, thus creating a situation similar to that facing us in this case. In City of Los Angeles v. Tower, 90 Cal.App.2d 869, 204 P.2d 395 (1949), property of the Hughes Tool Company had been condemned for a power line right of way by the City of Los Angeles. The city had entered in 1942 under the immediate possession provisions of Cal. Const. Art. 1, § 14, but trial was not had until 1947, and damages were fixed as of this later date. Hughes argued that damages could not constitutionally be fixed as of the date of trial where immediate possession was granted to the condemnor prior to trial. This contention was rejected on the strength of the California authorities previously cited, and the court said:

> "[I]t cannot be successfully contended that the mere entry into possession by the condemnor amounts to such a complete and irrevocable taking as to require application of the rule that the owner is entitled to the value of his land at the time it is taken. The Constitution guarantees ·that he be compensated only for whatever is taken from him—the value of use for the time he is deprived of it, and the value of the fee or easement, and damages as of the time when title either actually or constructively passes. * * *" 90 Cal.App.2d at 875, 876, 204 P.2d at 400.

█ Under the reasoning of these cases, which we accept and adopt, the legislature may establish some convenient time, as of which the value of the property will be assessed and the amount of compensation fixed. The date of summons, the date of trial, or some other date during the proceedings might have been chosen. The legislature has established the date of trial as this time in § 9–518 A.R.S., and while, in particular cases, the condemnee might fare better or worse under this than under another possible rule, the condemnee may not complain when, because of market

fluctuations, the compensation fixed by this rule is less than the market value at some other time during the condemnation proceedings. Nor is the situation altered when the condemnor is permitted to go into possession prior to the date as of which compensation is fixed, since the market value on that date is unaffected by the identity of the party in possession.

When immediate possession is granted to the condemnor, however, the condemnee is deprived of the use of his property between the date of such entry and the date when the compensation is paid to him. He would therefore be entitled to interest on the amount of the award from the date of entry by the condemnor, Metropolitan Water District v. Adams, 16 Cal.2d 676, 107 P.2d 618 (1940), or to compensation for the use value of the property between the date of entry under the immediate possession statute and the date the condemnor would otherwise be permitted to take possession of the property, Los Angeles County Flood Control District v. Hansen, 48 Cal.App.2d 314, 119 P.2d 734 (1941); City of San Rafael v. Wood, 144 Cal.App.2d 604, 301 P.2d 421 (1956).

If the condemnor who is granted possession prior to the date as of which the compensation is fixed wilfully or negligently diminishes the value of the property through acts of waste, compensation and damages therefor must be included in the award to the condemnee. The immediate possession statute, § 12–1116, is clearly broad enough to cover such contingencies:

"D. The money shall be deposited with the clerk of the court, and held by him for the use and benefit of each person having an interest in each parcel of land sought to be condemned, subject to final judgment after the trial of the action, and held also as a fund *to pay any further damages and costs recovered in the proceedings*, as well as all damages sustained by defendant if for any cause the property is not finally taken for public use. The deposit of the money shall not discharge plaintiff from liability to maintain the fund in full, but it shall remain deposited for all *accidents, defalcations or other contingencies*, as between the parties to the proceedings, at the risk of plaintiff, until the compensation or damage is finally settled by judicial determination * * *." (Emphasis added)

### Contention No. 5

The petitioner contends that the City is without authority to condemn its property because it has failed to comply with § 9–514 A.R.S.[2] which, it is urged, requires an elec-

---

2. "§ 9–514. Authority to engage in utility business

"Before construction, purchase, acquisition or lease by a municipal corporation,

tion prior to the acquisition of each and every utility acquired by the City. It is argued that the general proposition approved by the voters on August 8, 1958, does not give authority for the acquisition of this particular utility.

█ We do not find it necessary to construe this section since it appears that the election in question was a bond election which fully complied with the requirements

of the Municipal Bond Article (§§ 9–521 to 9–540 A.R.S.). This article gives the City power to acquire utilities by eminent domain and to issue its bonds to finance the cost thereof [3] upon the assent of a majority of the electors voting at a bond election.[4] The requirements of the municipal bond article were fully satisfied by Proposition No. 7,[5] which was submitted to the voters at the election of August 5, 1958, and which carried by a vote of 7,089 to 1,401. More-

---

as authorized in §§ 9–511 to 9–513, inclusive, of any plant or property or portion thereof devoted to the business of or services rendered by a public utility shall be undertaken, the construction, purchase, acquisition or lease shall be authorized by the affirmative vote of a majority of the qualified electors who are taxpayers of the municipal corporation voting at a general or special municipal election duly called and held for the purpose of voting upon the question."

3. "§ 9–522. Power to issue bonds
"A. In addition to its other powers a municipality may: 1. Subject to the requirements and restrictions of §§ 9–515 through 9–518, within or without its corporate limits, * * * acquire, by gift, purchase or the exercise of the right of eminent domain, a utility undertaking or part thereof, and acquire in like manner, rights in land or water rights in connection therewith. 2. Issue its bonds to finance the cost thereof."

4. "§ 9–523. Bond election
"Questions on bond issues under this article shall be submitted to the real property taxpayers who are in all respects qualified electors of the municipality. No bonds shall be issued without the assent of a majority of the qualified electors voting at an election held for that purpose as provided in this article."

5. Proposition No. 7
"Shall the City of Tucson issue $10,-000,000 additional WATER REVENUE

BONDS (within the limitations of Resolution No. 2260 adopted December 19, 1949, so long as the Water Revenue Bonds authorized thereunder are outstanding) for the purpose of paying the cost of making improvements, extensions, renewals, replacements and repairs to the WATERWORKS PLANT AND SYSTEM of said city (within and without the corporate limits of said city) including the acquisition by purchase, construction or otherwise, and the installation of additional sources of water supply, water storage facilities, wells, treatment facilities, pumping equipment, conduits, pipe lines, water mains, fire hydrants and all necessary water, water rights, rights-in-land, properties, facilities and equipment therefor; and the acquisition by gift, purchase or the exercise of the right of eminent domain of water utility properties, systems or undertakings, and all necessary water, water rights, rights-in-land, properties, facilities, and equipment therefor; together with the payment of all proper incidental expenses, said bonds to bear interest at a rate of not exceeding five per cent per annum, to mature in such installments as may be fixed by the Mayor and Council, with a maximum maturity of 30 years from their date, and to be payable solely from the revenues derived by the City from the operation of its waterworks plant and system?"

over, this article provides that its provisions shall control over inconsistent provisions of other laws, and specifically excludes the application of § 9–514.[6]

## Contention No. 6

 Finally, the petitioner urges that the City has failed to comply with the provisions of its charter which states:

"* * * provided, that no public utility shall be purchased, leased, acquired, sold or in any manner disposed of without the assent of a majority of the taxpayers, who must be qualified electors of the city, voting on the question at a general or special election at which such question may be submitted." Ch. 4, § 1, sub-division 25, Tucson City Charter.

This provision appears in an enumeration of the powers of the City. It is obvious that it was intended to give the voters control over the City in its exercise of the power to operate a public utility, and not as a measure to protect privately owned utilities. It speaks in terms of utilities as such, not in terms of particular properties which may be acquired and incorporated into an existing utility operation, which is the situation in the instant case. The approval by the voters of Proposition No. 8 on August 5, 1958, under which the city would "improve and extend its Water Utility by acquiring by purchase or by eminent domain the property, plant facilities, rights or assets of any public utility company or undertaking rendering water service within or without the corporate limits of said City," fully satisfied the requirements of this charter provision.

Since we find no merit in any of the petitioner's arguments we order that the Alternative Writ issued in this case be quashed.

UDALL, V. C. J., and STRUCKMEYER, JENNINGS and LOCKWOOD, JJ., concur.

---

6. "§ 9–537. Supplemental nature of article
 "In so far as the provisions of this article are inconsistent with any other provision of law, the provisions hereof shall be controlling. * * * Except as expressly provided in this article, the utility undertaking may be * * * acquired, notwithstanding any other law providing for the * * * acquisition of a like utility undertaking and without regard to the requirements, restrictions or other provisions contained in any law, including, but not limited to, §§ 9–511 to 9–514, inclusive. * * *" (Emphasis added.)