836 P.2d 1010

**CALMAT OF ARIZONA, an Arizona corporation, Plaintiff–Appellant, Cross Appellee,**

v.

**STATE of Arizona, ex rel., Charles L. MILLER, Director of Department of Transportation, Defendant–Appellee, Cross Appellant.**

No. 1 CA–CV 89–602.

Court of Appeals of Arizona, Division 1, Department E.

April 14, 1992.

Review Denied and Cross-Petition for Review Granted as to issue No. 1 and Denied as to issue No. 2 and all other issues Oct. 6, 1992.

Snell & Wilmer by Lonnie J. Williams, Jr., Jeffrey Messing, Phoenix, for plaintiff-appellant, cross appellee.

Grant Woods, Atty. Gen. by Joe Acosta, Jr., Asst. Atty. Gen., Phoenix, for defendant-appellee, cross appellant.

## AMENDED OPINION

GRANT, Judge.

On February 13, 1992, this court filed an opinion in this matter which reversed and remanded the judgments and granted the cross-appeal. A review of both appellant's and appellee's motions for reconsideration and the responses thereto suggest we need to address the confusion about the remand due to the granting of the state's cross-appeal. The parties are correct in pointing out to the court that the state, in its cross-appeal, asks for a remand for a new trial on the riverbed issue only in CV 87–17569 and not in C–555355. We have amended the opinion accordingly by issuing this supplemental opinion and vacating the opinion filed on February 13, 1992. In all other respects both parties' motions for reconsideration are denied.

This appeal arises from condemnation proceedings. Calmat of Arizona ("Calmat") received jury verdicts awarding it damages from the State of Arizona in each of two condemnation proceedings that had been consolidated for trial. The jury awarded damages for the property taken in one case and awarded severance damages in the other. In the action for severance damages (C–555355), the trial court subsequently concluded that Calmat had failed to produce evidence to establish the proper measure of severance damages and, accordingly, entered judgment notwithstanding the verdict for the state. In the other action (CV 87–17965), the trial court granted the state a new trial because it concluded that the jury's verdict was based on an incorrect ruling by the court regarding the time of valuation of the property.

Calmat appeals, arguing that the trial court erred in granting judgment notwithstanding the verdict in the one case and a new trial in the other. On cross-appeal, the state argues that, even if this court reverses the trial court's rulings, the state should be allowed a new trial in CV 87-17569 in order to challenge ownership of the portions of the property located in the Salt River bed, which the trial court previously prevented it from doing.

## FACTS AND PROCEDURAL HISTORY

The state needed property owned by Calmat for two separate construction projects related to its freeway system in Phoenix. One project was the construction of a drainage system for the inner loop of the freeway. The other project was the widening of the I-10 bridge that crosses the Salt River bed near 24th Street in Phoenix.

On September 13, 1985, the state filed its condemnation action in Maricopa County Superior Court Cause No. C-555355 to condemn a portion of a larger parcel of land Calmat owned in the vicinity of 20th Street and University Avenue in South Phoenix. This portion was needed for the inner loop drainage project. The state posted a bond and took immediate possession of the property in March of 1986, pursuant to court order as authorized in Ariz.Rev.Stat.Ann. ("A.R.S.") section 12-1116. The remaining portion of Calmat's property, which was not taken, was being used by Calmat to mine sand and gravel.

Prior to trial, the parties reached an agreement that the state would pay Calmat $2.75 per square foot for the property it took, amounting to a sum of $1,170,762. The settlement was made without prejudice to Calmat's right to seek recovery for severance damages to the remainder of its property. Eventually, the parties also agreed to settle certain aspects of the severance damage claim—i.e., the damages Calmat suffered in raising the banks of the drainage channel and in increased hauling costs—for a sum of $134,171. The issues remaining for trial on Calmat's severance damage claim, then, were whether the remaining portion of property had decreased in value because of the taking and, if so, in what amount.

In October of 1985, the state had also filed a condemnation action in Maricopa County Superior Court Cause No. C-557965 to acquire the portions of Calmat's property on either side of the I-10 bridge, which it needed for its widening project. In December of 1985, the state posted its bond and took immediate possession of the property pursuant to court order. It proceeded to use the property to widen the bridge and the freeway lanes going across the bridge. The state took no further action to bring the suit to trial, however, and the case was eventually dismissed for lack of prosecution on November 5, 1986.

Eight months later, after nothing more had been done to compensate Calmat for this property, Calmat filed an action in inverse condemnation in Maricopa County Superior Court Cause No. CV-87-17569. Only then did the state attempt to have its condemnation suit in C-557965 reinstated, but the court in that action denied the state's motion. Realizing that the state, in the inverse condemnation suit, might try to have the property valued as of the date when it filed the original condemnation action or as of the date when it took physical possession of the property, Calmat filed a motion *in limine* seeking to have the property valued as of the date the summons was issued in the inverse condemnation suit.

The trial court granted the motion *in limine* finding that A.R.S. section 12-1123, which mandates that the valuation date be the date of the issuance of the summons, was applicable to inverse condemnation actions as well as condemnation actions brought by the state. The trial court stated that any windfall Calmat might receive due to having a 1987 valuation date, rather than a 1985 date, was justified because the state could have avoided the situation by diligently prosecuting the original action.

Calmat also filed another motion *in limine* to prevent the state from claiming that it owned any portion of Calmat's property located in the Salt River bed. Calmat argued that the state waited too long to

disclose what its experts would say to try to establish such a claim, and failed to timely supplement Calmat's request for interrogatory answers. Calmat also argued that the state was estopped from claiming ownership of the Salt River bed because of inconsistent positions it had taken in various prior lawsuits, including the original action the state had filed to condemn this same property. In that suit the state's complaint had alleged Calmat to be the owner of the property, and the state made no claim of ownership. The trial court granted this motion *in limine* "for any and all of the reasons raised in plaintiff's Motion and Reply including estoppel and belatedness of disclosure." The state has filed a cross-appeal from this ruling by the trial court.

The state's suit to determine severance damages in C–555355 and Calmat's suit for inverse condemnation in CV–87–17569 were consolidated and proceeded to trial before a jury. In the severance damages action, the state filed a motion for directed verdict, claiming that Calmat had failed to produce any evidence from which a proper determination could be made as to whether the state caused any severance damage to the remaining portion of Calmat's property by the taking of the other portion of the parcel for the inner loop drainage project. The trial court denied this motion. The jury then returned a verdict for Calmat, assessing the state severance damages in the amount of $434,746.50.

In the inverse condemnation action, the jury was instructed to value the property as of June 1987. The jury made an award of $6.71 per square foot for the 245,389 square foot parcel lying on one side of the freeway, for a total award of $1,646,560.10. The jury awarded $1.00 per square foot for the 55,625 square feet of property lying on the other side of the freeway in the river bottom, for a total award of $55,625. These sums were to be awarded in addition to the sum of $546,000 that the parties had agreed during trial would be paid to Calmat for its lost ability to lease two commercial billboard signs on its remaining property following the state's taking.

The trial court entered formal judgments for the sums the jury had awarded plus the additional sums upon which the parties had reached agreement. At the same time the trial court issued a lengthy minute entry order expressing its concern that the totality of the circumstances may have resulted in substantial injustice to the state. The court invited the filing of post-trial motions by the state. The court indicated that it was concerned with "1) the adequacy of representation afforded the State by its counsel in these cases, 2) the over-reaching by Calmat and its counsel in these cases, and 3) the correctness of the Court's ruling that the valuation date for the I–10 property was June 25, 1987." The court questioned whether the net effect of the jury verdicts on some issues, along with the settlement of other issues, had resulted in an overpayment by the state. The trial court also remarked that the extent of the apparent windfall to Calmat caused by the 1987 valuation date led it to question the propriety of its ruling on that issue.

Thereafter, the state filed a motion for judgment notwithstanding the verdict in the action for severance damages. The state's motion argued, *inter alia,* that Calmat had presented insufficient evidence to support a finding of severance damages by failing to present a before-and-after comparison of value. The state filed a motion for new trial in the inverse condemnation action, arguing that the court erred in requiring the property to be valued as of 1987 when property values were inflated. Additionally, in CV 87–17965, the state asked for a new trial to allow it to make a claim of ownership of property within the bed of the Salt River.

The trial court denied the state's request for a new trial to allow it to claim ownership of the Salt River bed. However, it granted the state judgment notwithstanding the verdict in the severance damage suit, stating that "after reflection and additional consideration of the applicable authorities, the Court concludes that Calmat's severance damage approach in this case was inadmissible and insufficient to support any severance damages." The trial court also granted a new trial in the in-

verse condemnation suit, reversing its previous decision that a 1987 valuation date was proper. The trial court stated that some windfall to Calmat was justified by the state's dilatory action in prosecuting the original condemnation action. However the court also stated that had it realized that Calmat was also asking for, and would be entitled to, back rent and back interest dating to 1985 when the state took possession of the property, the court would have rejected the request for a 1987 valuation date. Calmat filed its appeal from these two orders. The state cross-appeals on the issue of ownership of the riverbed in the I–10 bridge case (CV 87–17569).

## SEVERANCE DAMAGES

### (C–555355)

Calmat argues that the trial court erred in granting the state's motion for judgment notwithstanding the verdict, thereby reversing the jury's award of severance damages in the condemnation action involving the drainage project. A judgment notwithstanding the verdict is proper only when there is neither evidence nor reasonable inferences from evidence that can be drawn that would support the jury's verdict. *Ryan v. State*, 150 Ariz. 549, 553, 724 P.2d 1218, 1223 (App.1986). "When reviewing a judgment notwithstanding the verdict, the evidence should be viewed in the light most favorable to the party against whom the motion was made, and if there is any substantial evidence from which reasonable [minds] could have found the ultimate facts to be such as to sustain the verdict, a motion for judgment notwithstanding the verdict should be denied." *Midas Muffler Shop v. Ellison*, 133 Ariz. 194, 197, 650 P.2d 496, 499 (App.1982). Calmat argues that it presented sufficient evidence from which the jury properly could have reached its decision and, therefore, the judgment notwithstanding the verdict should be reversed.

The parties stipulated before trial that Calmat had been using its property to mine sand and gravel prior to the taking. Calmat presented evidence at trial establishing that, as the result of the state's taking of a portion of its property to construct a drainage system, Calmat would be unable to mine a portion of its remaining property. For example, Calmat's witnesses explained that Calmat must leave a "setback" between its pit and the state's easement, and must slope its excavation to avoid collapsing the walls of the drainage channel. The witnesses also explained that the state's project cut Calmat's mining pit into two pits and separated the newly created east pit from Calmat's processing plant. This required Calmat to leave areas otherwise mineable for use as a road from the east pit around the drainage channel to the processing plant on the west side. Additionally, Calmat would be compelled to build an additional ramp to allow its trucks and equipment access down into the newly created pit.

Calmat's expert witness, Mr. Mawhinney, testified that the mining of sand and gravel was the highest and best use and, in fact, the only reasonable use that could be made of the property. He further testified that the value of the property for that purpose was $2.75 per square foot. He testified that, to the extent any portion of the property could no longer be used for mining, it had no value. Calmat produced exhibits giving the precise dimensions of the areas of the remainder of the property Calmat would not be able to mine after the taking. Using these dimensions and the $2.75 per square foot figure, Mr. Mawhinney testified that Calmat's severance damages were $1,400,000, the value of the land in the remaining parcel that Calmat was unable to mine.

Although the state's expert witnesses disagreed somewhat on the amount of property Calmat would be required to leave for slopes and setbacks, they otherwise agreed that Calmat would not be able to mine certain portions of its remaining property due to the taking. In arguing that Calmat suffered no severance damages, the state relied on the testimony of its appraiser, Mr. Francy, that the property was suitable for various industrial uses and thus had value. Mr. Francy testified that he felt the property had a value of $2.75

per square foot for these other industrial purposes.

Calmat's witnesses countered, however, that the property had been excavated previously and had been filled with oversized rocks (referred to as "cobbles") which made the property unstable for building purposes. They testified that it would cost between $4.25 and $8.00 per square foot to make the cobble-filled area suitable for building purposes. Since neither side had taken the position that the property would ever be worth more than $2.75 per square foot for any purpose, the testimony of Calmat's witnesses supported a conclusion that mining was, in fact, the only reasonable use for the property.

As a backup position on valuation of severance damages, the state had one of its witnesses calculate the price of the sand and gravel Calmat would *not* be able to mine. The witness produced a range of figures between $261,000 and $312,000, representing the economic loss Calmat might suffer depending upon the depth to which the property would be mined.

■ In Arizona, severance damages are determined by the difference between the fair market value of the remaining property before and after the taking. *State ex rel. Miller v. Filler*, 168 Ariz. 147, 812 P.2d 620 (1991); *Pima County v. Palos Co. Unlimited*, 140 Ariz. 481, 483, 682 P.2d 1148, 1150 (App.1984). Only where it can be shown that there is no market for the property in question have the Arizona courts held that some other measure of damages may be used. *See, e.g., Pima County*, 140 Ariz. 481, 682 P.2d 1148; *State ex rel. Herman v. Southern Pacific Company*, 8 Ariz.App. 238, 445 P.2d 186 (1968). In this case the jury was properly instructed that the measure of severance damages is the difference between the fair market value of the remaining property *before* the taking and the fair market value of the remaining property *after* the taking. The jury returned a verdict awarding Calmat $434,746.50 in severance damages.

In setting aside the jury verdict and granting judgment for the state, the trial court explained that it believed Calmat had failed to present evidence of the difference in market value of the property before and after the taking. The court stated:

There simply was no testimony relating to market value of the remaining property either before or after the taking. There was no evidence presented at trial to convert Calmat's "we can't mine this many square feet" evidence into a finding that the market value of the remaining property was diminished by any amount, let alone the amount Calmat asked for, which was the total value for the square feet Calmat said it couldn't mine.

The remaining property was over 400 acres of river bottom. The "bulk" of this 400 acres was admitted by Calmat to be unaffected by the taking. Calmat's severance damages theory was that it was entitled to be paid for the entire value of the land it claimed it could not mine after the taking. But the value of the unmineable land is not the measure of severance damages. *Suffield v. State*, 92 Ariz. 152, 375 P.2d 263 (1962). The only measure of severance damages is the effect, if any, of the taking on the fair market value of the remainder. Calmat presented no evidence on that issue.

■ In reviewing the effect of the testimony that Calmat presented, we disagree with the trial court's conclusion on this issue. There was evidence from which the jury could have found that Calmat's property had no use other than for mining sand and gravel. This was a use which totally depleted the property. The use of the property as part of the valuation process is properly an issue for the jury. *Maricopa County v. Barkley*, 168 Ariz. 234, 812 P.2d 1052 (App.1990). To the extent the state's taking prevented Calmat from depleting any portion of the property, a reasonable inference arose that that portion of the property had no value to anyone, and the taking therefore proportionally decreased the value of the whole. Although Calmat may not have set forth two figures, one showing the fair market value of the entire remaining property before the taking and one showing the entire value of the remain-

**306**

ing property after the taking, Calmat produced the difference between these two values by calculating the value of the portion of the property it was no longer able to mine. In addition, there was evidence in the record of the size of the entire remaining property and the size of the remaining property which could no longer be mined. The jury had the $2.75 per square foot figure used by Calmat's expert as well as various figures supposedly representing the square footage of property used for mining sand and gravel. Thus, the jury had before it all the information it needed to determine the fair market value of the property before and after the taking.

The fact that the jury returned a verdict in an amount that was less than the figure Calmat's expert calculated does not make its verdict erroneous. As the court explained in *City of Tucson v. Gastelum,* 25 Ariz.App. 127, 129, 541 P.2d 590, 592 (1975):

> [T]he trial court and the jury are not bound to fix the verdict or judgment at the exact sum testified to by any one of the witnesses, especially when the conclusions are based upon many factors. They may instead take part of the necessary factors from the testimony of one witness and part from that of another, and reach a result anywhere between the highest and lowest estimate which may be arrived at by using the various factors appearing in the testimony. Any combination which is reasonable will be sustained by the trial court.

We are satisfied that there was evidence in the record from which the jury could have calculated the proper measure of severance damages. Accordingly, the trial court's judgment for the state notwithstanding the verdict on this issue is reversed and this case (C–555355) is remanded with directions to the trial court to reinstate the jury verdict and enter judgment accordingly.

## DATE OF VALUATION
### (CV 87–17567)

■ We next consider whether the trial court erred in concluding that its instruction to the jury deprived the state of a fair trial due to the inflation in land values that occurred between 1985 and 1987, entitling the state to a new trial using the 1985 property values. The instruction in question required the jury to value the property taken to widen I–10 as of June 1987, when the summons in the inverse condemnation suit was served, rather than sometime in 1985 when the state filed the original suit and took possession of the property. "The power to grant a new trial is largely within the trial court's discretion, but its power is not unlimited." *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 496, 733 P.2d 1073, 1079, *cert. denied* 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987). "[I]f it appears clearly from the record that there was no error in the matters presented in the motion for new trial, it is an abuse of discretion for the court to grant a new trial." *Helena Chemical Company v. Coury Bros. Ranches, Inc.,* 126 Ariz. 448, 450, 616 P.2d 908, 910 (App.1980).

The Arizona legislature has chosen a specific time to be used for valuation of property in condemnation suits. A.R.S. section 12–1123(A) provides that the time for valuing the property shall be the date of the summons.[1] The statute does not expressly state whether this valuation date applies to inverse condemnation actions. The trial court in this case ultimately decided it was not compelled to apply the statute under the circumstances presented in this case, and that it was free to determine the valuation date that it found to be the most fair. The trial court had originally used the later valuation date, even though it might give some windfall to Calmat, because of the state's fault in failing to diligently prosecute the original action. After discovering the *extent* of the windfall, however, the trial court concluded that it had been unfair

---

1. A.R.S. section 12–1123(A) reads as follows:
   For the purpose of assessing compensation and damages, the right to compensation and damages shall be deemed to accrue at the date of the summons, and its actual value at that date shall be the measure of compensation and damages.

to use the later valuation date. The court justified its change of heart by adopting the reasoning of the Oregon Supreme Court in *State Highway Comm'n v. Stumbo*, 222 Or. 62, 352 P.2d 478, 483 (1960) that "a better case can be made for assessing compensation at the date of entry rather than at the time of filing the condemnation petition."

*Stumbo* was a case involving a condemnation action that was filed by the State of Oregon. The state had been in possession of certain property for a number of years under circumstances in which it had been unaware that it did not have title to the property. The court examined extensive authorities that dealt with the issue of when valuation of property should be made if possession precedes condemnation. Even in situations where the state or other public bodies were trespassing condemnors, the court found that the authorities were equally divided as to whether the date of possession or a later date tied to the condemnation action should control the amount of damages. Before adopting the date of entry as the better rule, the Oregon court commented that the divergent opinions expressed in the numerous cases illustrate that "neither date for fixing damages has any compelling logic to commend it." 352 P.2d at 482.

In *Stumbo*, as in many of the cases cited therein, the Oregon court was able to choose a time for valuation of the property because the legislature had not fixed the time. The court in *Stumbo* noted that the relevant Oregon statute "does not, in express terms, attempt to fix the time for ascertaining damages in the ordinary case where condemnation precedes possession, and furnishes no guide where possession, in violation of statute, has become an accomplished fact at the time of filing proceedings to condemn." *Id.* 352 P.2d at 481.

 If a jurisdiction has a statute that fixes the time in which to value property being condemned, a court ordinarily has no authority to disregard the time selected by the legislature. In *Desert Waters, Inc. v. Superior Court*, 91 Ariz. 163, 370 P.2d 652 (1962), the Arizona Supreme Court dispelled the notion that a condemnee has the right to have compensation fixed as of a particular date and upheld the right of the legislature to establish some convenient time for valuing property. *Id.* at 172–173, 370 P.2d at 658. The court quoted, with approval, language from a California case, *City of Los Angeles v. Oliver*, 102 Cal.App. 299, 283 P. 298, 303 (1929):

> [T]he fixing of a particular date at [sic] a time basis for the estimation of property values in condemnation suits is not a legislative interference with the right to just compensation guaranteed by the Constitution—which is but another way of stating that there is no vested right to have compensation assessed as of any particular date. * * * [T]he constitutionally guaranteed right to receive just compensation for property taken or damaged for public purposes neither includes nor implies the right to have such compensation ascertained by any particular procedure or as of any certain date.

The Arizona court acknowledged that, in particular cases, the condemnee might fare better or worse under the valuation date selected by the legislature, but "the condemnee may not complain when, because of market fluctuations, the compensation fixed by this rule is less than the market value at some other time during the condemnation proceedings." *Id.* 91 Ariz. at 173–174, 370 P.2d at 659. For the same reason, the reverse would also be true: the state cannot complain when the date, by chance, causes the market value to be higher.

It is clear from the language of A.R.S. section 12–1123 that in a direct condemnation case initiated by a public body, the property is valued as of the date of the summons. The question for us to decide is whether the legislature intended for this statute to govern inverse condemnation proceedings as well. If the statute applies to all condemnation proceedings, including inverse condemnation proceedings, then the trial court abused its discretion in granting a new trial so that a 1985 valuation date could be used.

There is no Arizona case on the precise question of whether the date of valuation fixed by the legislature in A.R.S. section 12–1123(A) applies in inverse condemnation proceedings. Calmat correctly points out, however, that the Arizona courts have consistently held that Arizona's condemnation statutes are applicable to inverse condemnation proceedings. Although *Dong v. State*, 90 Ariz. 148, 367 P.2d 202 (1961), did not involve an inverse condemnation proceeding, the Arizona Supreme Court made it clear that A.R.S. section 12–1123(A) was a "general condemnation statute" that would be applicable in the absence of a valid, more specific statute. *Id.* at 149, 367 P.2d at 203. In *State v. Hollis*, 93 Ariz. 200, 379 P.2d 750 (1963), the court held that A.R.S. section 12–1116, which governs venue in condemnation actions, controlled inverse condemnation actions as well as regular condemnation suits brought by public bodies. The court stated:

> That the landowner, in default of proper condemnation action by the State, must himself institute proceedings to secure compensation does not change the essential nature of the cause of action. It is still in the nature of a condemnation of a private property right by the State under the sovereign right of eminent domain.

*Id.* at 203, 379 P.2d at 751.

In *Salaz v. City of Tucson*, 157 Ariz. 251, 253, 756 P.2d 348, 350 (App.1988), Division 2 of this court noted that "[a]n inverse condemnation action is governed by the same statutes as a direct condemnation action." The court reversed an award of attorney's fees granted in an inverse condemnation suit because Arizona's direct condemnation statutes, A.R.S. sections 12–1111 through 12–1128, contain no provision for an award of attorney's fees. In *City of Phoenix v. Superior Court*, 158 Ariz. 214, 218, 762 P.2d 128, 132 (App.1988), this court cited to A.R.S. sections 12–1111 *et seq.*, as being among the statutory remedies provided by the legislature for acts of eminent domain and inverse condemnations.

Although these cases demonstrate that Arizona courts have consistently found that the intention of the legislature was that the direct condemnation statutes also apply to inverse condemnation proceedings, the state would have us carve out an exception for valuations. The state points out that Arizona's statute fixing the time for valuation in condemnation proceedings was adopted from a California statute, Cal. C.Civ.P. Section 1249, as that statute existed prior to 1911. *See* A.R.S. § 12–1123, Historical Note. The state argues that in *McDougald v. Southern Pac. R.R.*, 162 Cal. 1, 120 P. 766 (1912), the California court held that the date of valuation in an inverse condemnation case is the date of original entry, not the date of filing the action. This finding was made by the court despite the fact that Cal.C.Civ.P. Section 1249 ties the time for valuation in direct condemnation proceedings to the proceedings themselves. The state argues that this California case should be persuasive in convincing us that A.R.S. section 12–1123 was not meant to apply to inverse condemnation proceedings.

■ We are not persuaded. Cases from other jurisdictions interpreting statutes from which Arizona statutes are taken are not binding upon the Arizona courts, although they may be considered persuasive. *Viliborghi v. Prescott School Dist.*, 55 Ariz. 230, 100 P.2d 178 (1940); *see also, State v. McDonald*, 88 Ariz. 1, 352 P.2d 343 (1960). In examining the *McDougald* case, we find that although the California court held that the date of valuation in an inverse condemnation case was the date of original entry, the court decided the matter without even considering the question of whether the direct condemnation statute, providing for a later valuation date, should be applied to inverse condemnation action. Therefore, the case is not as useful as the state believes it to be.

Moreover, it would be unreasonable to hold that the Arizona legislature intended that the direct condemnation statutes apply, generally, in inverse condemnation proceedings, but that it intended an exception to the statute providing for valuation of property. We conclude that A.R.S. section 12–1123, which sets the time of valuation

of the property as the date of the summons, applies in inverse condemnation proceedings. Accordingly, we hold that the trial court was correct in its original ruling requiring that the valuation date in this case be the date of issuance of the summons in the inverse condemnation proceeding. The trial court erred in reversing its decision and granting a new trial to allow a 1985 valuation date.

We also advise that we have not been persuaded that the outcome in this case should be any different because the state originally took possession of the property pursuant to a valid court order in a condemnation suit initiated by the state. The state failed to diligently prosecute that action and therefore lost the right to the earlier valuation date. Any different ruling would signify that a dismissal for failure to prosecute a condemnation action would have no effect.

The trial judge on September 11, 1989, said the following in his minute entry:

The Court's reasoning for determining the valuation date as it did is explained in the September 26, 1988 minute entry ruling on Calmat's Motion in Limine concerning valuation date. The Court expressed agreement with the authority that "a better case can be made for assessing compensation at the date of entry rather than at the time of filing the [inverse] condemnation petition." *State v. Stumbo* [222 Or. 62], 352 P.2d 478, 483 (Or.1960). But the Court concluded, basically, that the State was inexcusably dilatory in letting its case get dismissed, so the filing of the earlier case would be ignored.

There was no mention in the September 26 minute entry of back interest or back rent; to the extent that the Court, at that time, considered those issues, it assumed that Calmat had waived any claim for back interest or back rent. The Court probably should have seen coming, but did not see coming, that Calmat was seeking not only a 1987 valuation date, but also interest on the 1987 valuation retroactive to 1985, or back rent for the 1985–1987 period.

Had the Court appreciated all that Calmat was looking for in this Motion in Limine, the Court definitely would have denied Calmat's request for a 1987 valuation date and applied the *Stumbo* reasoning and the Arizona statutes and set the valuation date at the original summons date, October of 1985.

Once the Court appreciated all that Calmat was reaching for here, the Court tried to maintain some semblance of fairness to the 1987 valuation date ruling, and denied the back rent and back interest claims of Calmat. Calmat objected at the time, thus preserving the issue, and was over-ruled. The Court now must acknowledge that Calmat did not expressly waive any claim for back rent or back interest and that Calmat is entitled to compensation, whether it be called back interest or back rent, for the time between possession and valuation date, if the one precedes the other. See A.R.S. § 12–1123.

The state claims that many of the cases holding for the later date of valuation do so on the basis that the property owner should be allowed a rental value for the time prior to the initiation of proper condemnation proceedings and payments of compensation. The United States Supreme Court in *Seaboard Air Line R.R. Co. v. United States*, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 (1923) held that when the government takes possession prior to paying compensation, there is a constitutional requirement of paying interest to compensate the owner for the delay in payment. In Arizona, this requirement is met by the statutory provision of A.R.S. section 12–1123. Interest must be paid for the period starting from the date of possession to the date of payment. The state claims that if the court sets the valuation date of 1985, Calmat is fully compensated because it is also entitled to interest from that date. However, we agree with Calmat's argument that the valuation date is not a discretionary sanction subject to review when it subsequently proves harsher than intended. The valuation date is a matter of legislative mandate and not judicial discretion. Neither the trial court nor this court has the right to

alter it. The valuation date in an inverse condemnation action in Arizona is set by A.R.S. section 12–1123 and controlled by constitutional guarantees of just compensation.

The reason for the trial court's granting of the state's motion for new trial was erroneous, and we would reverse that order were it not for the state's cross-appeal which is granted.

## CROSS–APPEAL

■ Having reached a reversal in the I–10 bridge case, CV 87–17569, we must now consider the state's cross-appeal. For its cross-appeal the state asks that we grant a new trial in CV 87–17569 to allow it to claim an ownership interest in any portion of the property located in the bed of the Salt River, but only if this court has reversed the trial court in the case of *Arizona Center for Law in the Pub. Interest v. Hassell*, 95 Ariz.Adv.Rep. 13 (Ct.App., Sept. 10, 1991). In that case, the state took the position that it did not own the Salt River bed. The trial court held that the state could constitutionally issue quit claim deeds to claimants along areas within the banks of navigable rivers. Here, the state contends that if this court reverses the trial court in *Hassell* and concludes that the state cannot constitutionally give up its interest in navigable streams, because of the Equal Footing Doctrine, then it should be allowed retrial in this case.

■ This court has now issued its opinion reversing the trial court in *Arizona Center v. Hassell*. In that case this court held unconstitutional 1987 Ariz.Sess.Laws, ch. 127 (H.B. 2017) (codified at A.R.S. §§ 37–1101 to 37–1108, 12–510, and 12–529 (Supp.1990)), in which the legislature attempted to substantially relinquish the state's interest in all lands in the beds of Arizona watercourses that were navigable when Arizona was admitted to the Union. We held that H.B. 2017 violates the public trust doctrine and Ariz. Const. art. IX, § 7. Therefore we must consider the state's request on cross-appeal.

The state asks that the I–10 bridge case (CV 87–17569) be remanded for a new trial

and that the state be allowed to present evidence that a portion of the property being condemned was within a navigable stream and thus is subject to the public trust. If the trier of fact decides that some of the land is in the public trust, Calmat may not have a full claim to compensation for the property.

In response to the cross-appeal, Calmat argues that during discovery the state failed to raise the issue of ownership of the Salt River bed or to disclose its intention to present evidence supporting such a claim. The question of whether this was an adequate ground to support the trial court's decision to exclude evidence supporting the state's claim to ownership of the Salt River bed is complicated by the following circumstances. The evidence excluded was Mr. Halpenny's testimony concerning the navigability and the boundaries of the Salt River as they existed in 1912. The trial court made its ruling to exclude at a time when trial was imminent. Later, the trial was continued for several months for unrelated reasons. Since trial was postponed, the state did not seek to reopen the question of whether its evidence of ownership should be allowed. The state argues that such a request would have been futile because the trial court's ruling was based on estoppel arguments. If, however, close proximity to trial were the only reason the trial court ruled that disclosure of this issue was too late, then the state's argument is meritorious. However, the trial court's ruling may have been based on the fact that the state ignored repeated requests for disclosure, and the trial court may have been inclined to exclude the evidence on that basis, even though the trial was later postponed.

Calmat argues that it did not take discovery or list witnesses on the riverbed ownership issue in this case because the State never revealed its intention to call a witness supporting the claim that it owned the Salt River bed under the Equal Footing Doctrine. Therefore, Calmat claims the trial court correctly excluded that evidence at trial.

Furthermore, Calmat claims that the state is estopped from asserting an ownership interest in the riverbed because the

state's motion for summary judgment in *Hassell* argued that the state did *not* own the Salt River bed. We note that it has never been established by evidence, in this case or any other, that the Salt River was navigable at the time of statehood. We also note that the Attorney General of Arizona did *not* represent the state in *Hassell* since he had argued to the legislature that H.B. 2017 was unconstitutional.

The doctrine of judicial estoppel is sometimes referred to as the doctrine of preclusion of inconsistent positions. It is invoked to prevent a party from changing its position over the course of judicial proceedings when such changes have an adverse impact on the judicial process. *Yniguez v. State of Arizona*, 939 F.2d 727 (9th Cir.1991). Generally, equitable estoppel does not apply to the state in matters affecting sovereign immunity, and this is especially true if the claim of estoppel is based upon an *ultra vires* or illegal act of a government official. *Green v. Osborne*, 157 Ariz. 363, 758 P.2d 138 (1988). However, this rule is not absolute. Estoppel may apply against the state only when the public interest will not be unduly damaged, or when its application will not affect the exercise of governmental powers or make binding the unauthorized acts of the government. *Freightways, Inc. v. Arizona Corp. Comm'n*, 129 Ariz. 245, 630 P.2d 541 (1981). Given the substance of our holding in *Hassell*, we believe that this case must be remanded for a new trial at which the state shall be permitted to assert any ownership interest in this property. Binding the state by estoppel to a position asserted in another lawsuit, after that position has been declared unconstitutional, would unduly damage the public interest. Since *Hassell* determined that the state held the land of all navigable water courses within its boundaries as of February 14, 1912, when Arizona achieved statehood, the state must be allowed to put on evidence as to whether any of the condemned property in this case falls within the boundaries of any navigable watercourse. To agree that the state is estopped from presenting this evidence on remand would be inconsistent with our holding in *Hassell* that quit claims of riverbed land are unconstitutional and

that the state cannot waive its right to hold such lands in the public trust. Therefore the state has the duty to assert, and must assert, this ownership interest in this and any future condemnation litigation involving riverbed land.

## CONCLUSION

The trial court's order granting judgment notwithstanding the verdict in C–555355 is reversed. The case is remanded to the trial court with directions to enter judgment in accordance with the jury verdict. The I–10 bridge case (CV 87–17569) is remanded for new trial at which the state may assert an ownership interest in the property in accordance with this opinion.

CLABORNE, P.J., and SHELLEY, J., concur.

NOTE: Retired Judge MELVYN T. SHELLEY was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Arizona Constitution Article 6, section 20 and A.R.S. section 38–813 (1985).